UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank FREDMAN, Defendant–
Appellant.

No. 03–35808.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 2004.

Filed Dec. 10, 2004.

Jane E. Ellis, Portland, OR, for the defendant-appellant.

Jeffrey Kent, Assistant United States Attorney, Eugene, OR, for the plaintiff-appellee.

Before FERGUSON, TROTT, and KLEINFELD, Circuit Judges.

TROTT, Circuit Judge:

Frank Fredman appeals the district court's denial of his habeas corpus petition. Fredman argues that he was denied effective assistance of counsel because of his counsel's decision to admit in opening statement to some of Fredman's criminal wrongdoing. We conclude that the "confession and avoidance" tactic used by counsel does not constitute ineffective assistance of counsel. Because Fredman does not show that his counsel was constitutionally ineffective, we affirm the district court's denial of his habeas petition.

## BACKGROUND

In April of 1996, Fredman and Cynthia Herndon, Fredman's girlfriend at the time, traveled to Klammath Falls, Oregon. They stayed with co-defendants Angie and Wayne "Buck" Jenkins during the first few weeks of their sojourn in Oregon. Between April and July of 1996, they spent most of their time in Oregon but traveled also to other parts of the United States. At one point, Fredman took a short trip to Texas. Herndon testified that the purpose of this trip was to sell drugs. Fredman and Herndon later took a long road trip to New Jersey, stopping in Minneapolis to sell drugs to a man named Pat. While in New Jersey, they purchased a motor home from Fredman's brother. They returned to Oregon in approximately mid-July 1996, staying in Oregon motels for a few weeks before leaving the state.

Shortly before leaving Oregon, Herndon helped Fredman transfer chemicals, glassware, and other methamphetamine-related objects from a storage unit in Klammath Falls, Oregon, to Fredman's motor home. Fredman and Herndon left Oregon on July 23, 1996 with those objects still in Fredman's motor home. California police officers stopped Fredman's motor home in California the next day. The police found chemicals, glassware, and a heating mantle, and they arrested Fredman and Herndon on California state drug charges. Fredman pled guilty to conspiracy to manufacture methamphetamine in California state court and was sentenced to seven years in state prison.

After Fredman pled guilty to the California state drug charges, federal agents executed a search warrant on Angie and Buck Jenkins' Oregon residence, finding evidence of methamphetamine production, including lab equipment and glassware, chemical residue associated with methamphetamine manufacturing, and a spare tire containing three pounds of methamphetamine. A federal grand jury indicted Fredman, along with Buck Jenkins, Angie Jenkins, Edward Triplett, Robin Chartin, and Marcos Ramirez, on federal charges of conspiracy in Oregon to manufacture methamphetamine, manufacture of methamphetamine, and possession with intent to distribute methamphetamine. All co-defendants were tried jointly in the United States District Court for the District of Oregon.

Fredman's counsel, who knew what the prosecution was prepared to prove against his client, began his opening statement by telling the jury that "Frank Fredman is a meth cook." He told the jury that the government's investigation began in October of 1995 and ended in November of 1996 with a drug raid on the Jenkins's property, but explained that Fredman had been in Oregon only for parts of April through July of 1996. He admitted that Fredman came to Oregon to visit Buck and Angie Jenkins and Edward Triplett, and that at one point he stored mobile methamphetamine lab equipment in a storage unit in Klamath Falls, Oregon. Counsel then told the jury about Fredman's arrest and his guilty plea in California

state court for conspiracy to manufacture methamphetamine. Counsel emphasized Fredman's willingness to serve his time in California, stating:

> During the proceedings in California, [Fredman] made no bones about it. No plea bargains, no deals. He said, "I did it, and I will pay the price." ... Further, he offered, right there, to take seven years if Cynthia Herndon would be given a one-year sentence. Initially it was going to be four and four.

Counsel ended his opening statement by admitting that Fredman was friends with Buck and Angie Jenkins and Ed Triplett, but he insisted that "there's no evidence that he agreed to cook methamphetamine ... with any of these people."

The prosecution's opening argument described Fredman's role in the conspiracy as follows:

> [T]here's another person in this case who brought a special talent to this conspiracy, and that was the ability to effectively take the chemicals that were purchased by Ms. Chartin, with Ms. Jenkins' money, and the chemicals purchased by Mr. Triplett and the equipment that was provided by Mr. Triplett, and the glassware.... [Fredman] brought the talent of being able to bring all of these seemingly innocent items together for the purpose of manufacturing methamphetamine.

The prosecution then presented the following evidence against Fredman: Herndon testified that she helped Fredman transfer chemicals and glassware from the Klammath Falls storage facility into Fredman's motor home shortly before they left for California. The day after Fredman left Oregon, police in California found chemicals, glassware, and other methamphetamine-related objects in Fredman's motor home. Fredman admitted to Agent Richard Underwood, a criminal investigator for the California Highway Patrol, that Fred-

man had cooked ten pounds of methamphetamine in Oregon approximately two months before his arrest in California. Drug Enforcement Administration ("DEA") investigator Thomas Gorman testified that Fredman told him he was a "methamphetamine cooker, or a manufacturer," and that he had been in the business for twenty years.

In addition to Fredman's admission to being a methamphetamine cook by profession, Herndon's testimony detailed Fredman's participation in the Oregon conspiracy to manufacture methamphetamine. For example, Herndon testified that Fredman told her he was going to the Triplett's "to help out with a cook." She testified that "our whole reason for going up there, is that Buck and Angie [Jenkins] had agreed-had talked to [Fredman] and made arrangements for [Fredman] to go up there and help them. In turn, they were going to help him get on his feet down in California."

In closing argument, Fredman's counsel reminded the jury that he had admitted in his opening statement that "Frank Fredman is a meth cook." To dispute the prosecution's theory that Fredman "brought the talent to these folks," counsel emphasized that "methamphetamine manufacturing was happening in Klamath Falls well before Frank Fredman came onto the scene." Counsel admitted that Fredman traveled throughout the nation buying pills but insisted that "Frank Fredman is an independent ... [and] is disconnected from this scene." He argued that "[t]here's no evidence that Frank Fredman was going ... all over the nation to bring back pills to cook methamphetamine in Oregon." Counsel summed up the defense as follows:

> He's an independent. He's got a mobile lab. And he's doing time for that now.

And you have to find, beyond a reasonable doubt, that there was an agreement. And if you find that Frank Fredman and Cynthia Herndon were a conspiracy on their own, a mobile conspiracy, you have to acquit him in this litigation.

The jury convicted Fredman of all three charges: conspiracy to manufacture methamphetamine, manufacture of methamphetamine, and possession with intent to distribute methamphetamine. After we affirmed Fredman's conviction on direct appeal, Fredman filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2255, arguing that he had been denied effective assistance of counsel in violation of his Sixth Amendment rights. The district court denied the petition, concluding that counsel's defense strategy was reasonable. Fredman now appeals that denial.

## STANDARD OF REVIEW

We review de novo the denial of a 28 U.S.C. § 2255 petition for a writ of habeas corpus. *United States v. Alaimalo,* 313 F.3d 1188, 1191 (9th Cir.2002). We review the district court's factual findings for clear error. *Id.*

## DISCUSSION

### A. Ineffective Assistance of Counsel

■ To establish ineffective assistance of counsel, the petitioner must first show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The ultimate question is whether counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance or what

" 'might be considered sound trial strategy.' " *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

In addition to establishing that counsel fell below an objective standard of reasonableness, a petitioner must also demonstrate prejudice. *Id.* at 687, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

■ Fredman argues that his ineffective assistance of counsel claim is established by the fact that his counsel began the opening statement by admitting that "Frank Fredman is a meth cook" and admitting that Fredman had been convicted in California state court of conspiracy to manufacture methamphetamine. We disagree.

Counsel's admission that Fredman was a "meth cook" and that he had been convicted in California of conspiracy to manufacture methamphetamine was part of counsel's reasonable defense strategy. These admissions were consistent with the reasonable and effective defense tactic of conceding weaknesses in Fredman's case in an attempt to shift the jury's focus from the strong evidence against Fredman to an issue more favorable to Fredman. In other words, counsel's statements were an attempt to shift the focus from whether Fredman was a methamphetamine cook to whether Fredman was part of a conspiracy to manufacture methamphetamine in Oregon.

In *Yarborough v. Gentry,* 540 U.S. 1, 11, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003), the Supreme Court rejected a similar ineffective assistance of counsel claim. There, counsel stated in his closing argument that the jury must acquit Gentry if the jury believed Gentry's account of the events,

even though Gentry was a "bad person, lousy drug addict, stinking thief, jail bird." *Id.* at 9, 124 S.Ct. 1. The Supreme Court reasoned that "[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case." *Id.* at 9–10, 124 S.Ct. 1 (citing J. Stein, Closing Argument § 204, p. 10 (1992–1996) ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate")). Indeed, such an admission in an attempt to bolster credibility with the jury is "precisely the sort of calculated risk that lies at the heart of an advocate's discretion." *Gentry,* 540 U.S. at 9, 124 S.Ct. 1.

Here, counsel's admission that "Frank Fredman is a meth cook" was manifestly calculated to build credibility with the jury by allowing the jury to learn this fact directly from Fredman's counsel rather than from the prosecution. Counsel's credibility would have been diminished had he denied that Fredman had any connection to the methamphetamine manufacturing business only to have the prosecution prove precisely the opposite. Fredman, himself, admitted to a DEA investigator that he was a "methamphetamine cooker, or a manufacturer," and that he had been in the business for 20 years. Fredman's statement to the DEA investigator was admissible, and counsel made the reasonable decision that he would rather the jury hear it from defense counsel than from the prosecution.

The defense strategy of telling the jury that Fredman had been convicted in California of manufacturing methamphetamine, but arguing that he was not involved in the conspiracy to manufacture methamphetamine in Oregon, was reasonable in light of the overwhelming evidence against Fredman. Counsel attempted to spin the evidence in Fredman's favor by emphasizing that Fredman had accepted his California state court punishment, saying, in effect, "I did it, and I will pay the price."

Telling the jury that the police found Fredman's methamphetamine lab *in California,* and that Fredman had been convicted and was serving time *in California,* might convince the jury that Fredman's crime was California based and not Oregon-based. Telling the jury that Fredman willingly accepted the California state court sentence might persuade them that Fredman had already been punished for his crime. It also set up his defense that, although Fredman was a methamphetamine cook, he was not part of any conspiracy to cook methamphetamine in Oregon. As the district court correctly concluded, "the evidence against defendant was overwhelming and this led to the strategy to admit criminal activities in California in order to distance himself from the conspiracy in Oregon."

We recognized the reasonableness of a similar "confession and avoidance" defense in *United States v. Sanchez–Cervantes,* 282 F.3d 664 (9th Cir.2002). There, Sanchez–Cervantes had been indicted on counts of possession with intent to distribute methamphetamine, possession with intent to distribute cocaine, conspiracy to distribute controlled substances, and illegal reentry into the United States. *Id.* at 665–66. Following counsel's advice, Sanchez–Cervantes testified at trial and admitted to illegally reentering the United States and to being a small-time drug dealer but denied involvement in the conspiracy. *Id.* at 666, 672. After being convicted, Sanchez–Cervantes argued that he was denied effective assistance of counsel.

We concluded that counsel was not ineffective, finding that the advice to admit

to some crimes was "part of counsel's strategy to try to avoid a conviction for conspiracy." *Id.* at 672. The Government presented substantial evidence linking Sanchez–Cervantes to several drug deals as well as concrete evidence that Sanchez–Cervantes illegally reentered the country. *Id.* Counsel believed he could not win an acquittal on all charges but thought he could produce reasonable doubt on the conspiracy charge if Sanchez–Cervantes testified. *Id.* We reasoned that advising Sanchez–Cervantes to testify was not objectively unreasonable in these circumstances because "counsel had a valid reason for doing so and proceeded to examine Sanchez–Cervantes with that objective in mind." *Id.* Noting that "Sanchez–Cervantes' testimony was consistent with his being a small-time, solo drug dealer who was not connected to the other defendants," we concluded that "[i]t is not the role of the courts to second-guess an attorney's tactical decisions." *Id.*

Consistent with *Gentry* and *Sanchez–Cervantes*, we reaffirm the validity of the "confession and avoidance" tactic used by counsel in this case to avoid diminishing his credibility by arguing a lost cause. Counsel's admission that Fredman was a "meth cook" by profession and that he had been convicted in California for conspiracy to manufacture methamphetamine was all part of counsel's reasonable defense strategy to argue that Fredman operated independently from the Oregon conspiracy. Because we conclude that counsel's representation did not fall below an objective standard of reasonableness, we need not address the prejudice prong of the *Strickland* analysis.[1]

---

1. Fredman's remaining arguments as to his ineffective assistance of counsel claim have

**CONCLUSION**

Fredman fails to establish that his counsel was ineffective. Counsel's decision to admit that Fredman was a "meth cook" and that he had been convicted in California for conspiracy to manufacture methamphetamine was part of counsel's reasonable defense strategy.

AFFIRMED.

FERGUSON, Circuit Judge, concurring:

I concur in the opinion written by Judge Trott.

I write only to ensure that defense counsels realize that a "confession and avoidance" tactic is not something courts ordinarily will approve.

It must be understood that defense counsel's tactic here was reasonable only because no other defense was possible. As Judge Trott declares, defendant's case was a "lost cause."

no merit, and we do not address them here.