**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| HARSON CHONG, | No. 23-55140 |
| *Petitioner-Appellant*, | D.C. Nos.<br>2:19-cv-04028-<br>ODW |
| v. | 2:12-cr-01016-<br>ODW-2 |
| UNITED STATES OF AMERICA, | |
| *Respondent-Appellee*. | |
| | OPINION |
| TAC TRAN, AKA Tran Tac, AKA<br>Bruce Tran, AKA Tack Tran, AKA<br>Tak Tran, AKA Tau Tran, AKA Ouc<br>Wong, | No. 23-55142<br><br>D.C. Nos.<br>2:19-cv-04025-<br>ODW |
| *Petitioner-Appellant*, | 2:12-cr-01016-<br>ODW-1 |
| v. | |
| UNITED STATES OF AMERICA, | |
| *Respondent-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted March 26, 2024
San Francisco, California

Filed August 14, 2024

Before: Daniel A. Bress and Patrick J. Bumatay, Circuit
Judges, and Robert S. Lasnik,[*] District Judge.

Per Curiam Opinion;
Concurrence by Judge Bumatay

## SUMMARY[**]

### 28 U.S.C. § 2255 / Ineffective Assistance of Counsel

The panel affirmed the district court's denial of Tac Tran's post-conviction motion under 28 U.S.C. § 2255, reversed the denial of Harson Chong's § 2255 motion, and remanded for the district court to grant Chong § 2255 relief.

Chong and Tran alleged that they received ineffective assistance of counsel because their counsel failed to object to the search of Chong's home on Fourth Amendment grounds. They claimed that a Los Angeles County Sheriff's Department deputy entered the curtilage of Chong's home without a warrant or other proper justification. And because trespassing the curtilage led to spotting Tran with a baggie

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of drugs and the eventual discovery of guns, money, and more drugs in the home, they asserted that all the evidence should have been suppressed. Whether they were right depended on where the sheriff's deputy was standing when he saw the drugs in the garage. On remand from this court, the district court found that the deputy was standing just one foot from the home.

The panel concluded that, at that distance, it had no doubt that the deputy physically trespassed onto the curtilage. And the deputy's unconventional manner of entry onto the property objectively manifested his investigatory purpose, confirming that this trespass was unlicensed. The panel held that without a warrant, consent, or other exigency, this was unreasonable under the Fourth Amendment under both the common-law trespassory test and the reasonable-expectation-of-privacy test, and the unreasonableness was obvious, especially in the wake of the Supreme Court's seminal curtilage decision in *Florida v. Jardines*, 569 U.S. 1 (2013). The panel further held that the search could not be justified under the good faith exception to the exclusionary rule. For no strategic reason, defense counsel failed to make this clearly winning Fourth Amendment argument. Accordingly, Chong's counsel was ineffective in failing to move to suppress the evidence found in his house. But because Tran lacked standing to challenge the search, the panel saw no ineffective assistance on his counsel's part.

Concurring in full with the per curiam opinion, Judge Bumatay wrote that the government was incorrect in arguing that the common-law trespass thread of the Fourth Amendment was a relatively new phenomenon and it therefore was excusable for Chong's counsel to miss it. Judge Bumatay wrote that protection against trespassing

on curtilage is deeply rooted in our nation's history, and so it should have been obvious even before more recent Supreme Court cases' articulation of the Fourth Amendment right that counsel should have brought a motion to suppress.

## COUNSEL

Todd W. Burns (argued), Burns & Cohan Attorneys at Law, San Diego, California, for Petitioner-Appellant.

Rosalind Wang (argued) and David R. Friedman, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Chief, Criminal Appeals Section; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Respondent-Appellee.

## OPINION

PER CURIAM:

In their federal post-conviction motions, Harson Chong and Tac Tran allege they received ineffective assistance of counsel because their counsel failed to object to the search of Chong's home on Fourth Amendment grounds. They claim that a Los Angeles County Sheriff's Department deputy entered the curtilage of Chong's home without a warrant or other proper justification. And because trespassing the curtilage led to spotting Tran with a baggie of drugs and the eventual discovery of guns, money, and more drugs in the home, they assert all the evidence should have been suppressed. Whether they are right depends on

where the sheriff's deputy was standing—on Chong's curtilage or elsewhere—and why the deputy entered this part of Chong's property. On remand from this court, the district court was asked to determine exactly where the deputy stood when he saw the drugs in the garage.

We now have that answer. Just one foot away from the home. At that distance, we have no doubt that the deputy physically trespassed onto the curtilage. And the deputy's unconventional manner of entry onto the property objectively manifested his investigatory purpose, confirming that this trespass was unlicensed. Without a warrant, consent, or other exigency, this was unreasonable under the Fourth Amendment. The unreasonableness of the search was not merely debatable but obvious, especially in the wake of the Supreme Court's seminal curtilage decision in *Florida v. Jardines*, 569 U.S. 1 (2013), which was issued well before Chong and Tran's trial. But for no strategic reason, defense counsel failed to make this clearly winning curtilage argument. Given this, Chong's counsel was ineffective in failing to move to suppress the evidence found in his house. But because Tran lacked standing to challenge the search, we see no ineffective assistance on his counsel's part.

For these reasons, we reverse the district court's denial of Chong's motion under 28 U.S.C. § 2255 and direct the district court to grant that relief on remand. As to the denial of Tran's post-conviction motion, we affirm.

## I.

## Background

We begin with some of the key facts. In early 2012, a federal wiretap intercepted telephone calls between Hao

Tang, a drug distributor who was the target of a Department of Homeland Security investigation, and Tran, a state parolee. Those phone calls led authorities to believe that Tran had violated his parole conditions by engaging in criminal activity.

This is where Chong's house comes in. The phone calls linked Tran to a house located in the Los Angeles suburbs, after Tran was overheard giving Tang directions there. Although detectives at the time claimed they thought Tran lived at the house, he did not. The house was actually owned by Chong. Chong, who was Tran's nephew, lived in the house with his girlfriend, sister, his sister's husband, and their infant son.

In July 2012, Los Angeles County Sheriff's Department deputies set up surveillance outside Chong's house. The house was located at the end of a cul-de-sac with a short driveway and a two-car, attached garage facing the street. At around 9:00 p.m., Tran arrived at the house and walked through the front door without waiting for someone to open the door, although the deputy conducting surveillance did not see if Tran had a key to the residence. Shortly after, the garage door opened. At that point, the deputies believed they could conduct a parole search at the home based on Tran's presence there.

The deputies, including Deputy Choong Lee, approached Chong's home by entering the next-door neighbor's yard and hopping over the retaining wall and bushes on the left side of the property line. The deputies then crossed the front of Chong's house and approached the open garage by walking between the left-side doorframe and a car parked on the driveway. As they approached the garage door and driveway, they hugged a white lattice fence that partially

shielded the front door. As Deputy Lee stood on the driveway, about one foot from the open garage door, he saw Tran at a coffee table in the garage with two other men. On seeing Deputy Lee, Tran appeared startled and tossed a baggie of methamphetamine onto the table in front of him. The deputies subsequently detained Tran and seized the baggie.

The following depiction overlaid on a photograph of the house shows the path the deputies took to approach the garage. As seen below, the garage entrance was fully exposed from the sidewalk and no more than 1½ car lengths from the sidewalk. There was no fencing, vegetation, or other permanent obstruction or barrier between the sidewalk and the garage entrance. The garage was attached to the front of the house.



The deputies then conducted a protective sweep of the house, finding a large amount of cash in the living room. After the house was secured, a little after 11:00 p.m., the deputies obtained a search warrant for the house. Deputies then found large amounts of ecstasy, methamphetamine, cocaine, and marijuana; three guns; ammunition; and digital scales. Tran and Chong were later charged with federal drug and gun offenses.

During pretrial proceedings, Tran moved to suppress evidence from the search of Chong's house. He argued the deputies lacked probable cause to believe he was residing at the house, and so the parole-search justification was not valid. In a declaration, Tran stated that he did not live at the house. Chong also moved to suppress. In his declaration, Chong asserted that Tran "does not live with me," but he "visit[s] me from time to time." Neither declaration discussed whether Tran was staying at the house overnight that evening.

The district court denied the suppression motions. At first, the district court ruled that the search was justified by the parole-search exception. It found that the deputies had probable cause to believe that Tran was using the house as his "abode" based on his "comings and goings." After the district court's pre-trial ruling, we decided *United States v. Grandberry*, 730 F.3d 968 (9th Cir. 2013). *Grandberry* explained that for parole searches, "probable cause as to residence exists if an officer of 'reasonable caution' would believe, 'based on the totality of [the] circumstances,' that the parolee lives at a particular residence." *Id.* at 975 (simplified). We further emphasized that this is "a 'relatively stringent' standard" that requires "'strong evidence' that the parolee resides at the address." *Id.* at 976 (simplified).

In light of *Grandberry*'s explanation of the probable cause requirement, the district court reversed course and decided that law enforcement had not adequately surveilled Chong's home and thus could not point to sufficient facts to demonstrate probable cause that Tran lived there. Even so, the district court denied the suppression motion, concluding that Deputy Lee observed Tran discard the drugs in "plain view" and thus the later search of the garage was justified by exigent circumstances—needing to secure the drugs. At trial, Chong and Tran were found guilty on all charges.

After their convictions were affirmed on direct appeal, Chong and Tran moved for post-conviction relief under 28 U.S.C. § 2255. Chong and Tran alleged that their counsel was ineffective for failing to assert that the deputies trespassed onto the curtilage of Chong's home. Tran also alleged that his counsel was ineffective for failing to submit three declarations from residents of Chong's home supporting Tran's standing to challenge the search of the home. Based on the lack of boundaries in front of Chong's house, the district court determined that the deputies didn't enter the curtilage, found no ineffective assistance of counsel, and denied the post-conviction relief motions.

Chong and Tran appealed. We consolidated the appeals and vacated and remanded. We wanted the district court to figure out precisely where Deputy Lee stood when he observed Tran with the baggie of drugs, which we thought crucial to the curtilage analysis. On remand, the district court conducted an evidentiary hearing, at which Deputy Lee testified that he was just one foot away from the threshold of the garage entrance when he witnessed Tran throw the baggie of methamphetamine. The district court still denied post-conviction relief because it did not consider the area

where the deputy stood curtilage and found no expectation of privacy in the opened garage.

We review a district court's decision to deny a § 2255 motion de novo. *United States v. Aguirre-Ganceda*, 592 F.3d 1043, 1045 (9th Cir. 2010). We review the factual findings underlying a district court's § 2255 decision for clear error. *Id.*

## II.

### Ineffective Assistance for Failing to File Suppression Motion

For an ineffective assistance of counsel claim to succeed, a defendant must show two things.

One, the defendant must show that his counsel's performance was constitutionally deficient, meaning it fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). When considering a *Strickland* claim based on counsel's failure to bring a suppression motion, "the relevant question" is whether "no competent attorney would think a motion to suppress would have failed." *Premo v. Moore*, 562 U.S. 115, 124 (2011).

Two, the defendant must show his counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687–88. To "show prejudice when a suppression issue provides the basis for an ineffectiveness claim, the petitioner must show that he would have prevailed on the suppression motion, and that there is a reasonable probability that the successful motion would have affected the outcome." *Bailey v. Newland*, 263 F.3d 1022, 1029 (9th Cir. 2001) (simplified).

For ease of explanation, we start with prejudice and then move to performance.

## A.

## Prejudice

The Fourth Amendment guides our prejudice analysis here. The discovery of the drugs, guns, and money in Chong's home resulted from a sheriff's deputy intruding to within nearly one foot of the home's open garage door. As the deputy had no warrant authorizing him to stand so close to the home, we must determine whether his search violated the Fourth Amendment. If so, then his observations of Tran throwing the baggie of drugs from the driveway and the later search of Chong's home was improper, and the evidence gathered should have been excluded. *See United States v. Garcia*, 974 F.3d 1071, 1075 (9th Cir. 2020) ("The typical remedy for a Fourth Amendment violation is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant." (simplified)). And all this turns on whether the sheriff's deputy was standing within the curtilage of Chong's home when he saw Tran throw the drugs, and why he approached the home to get into that position. We conclude that the deputy was within the curtilage and that he had no license or other right to be there.

Start with the text of the Fourth Amendment. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment may be violated in "one of two ways." *United States v. Esqueda*, 88 F.4th 818, 823 (9th Cir. 2023). First, under the "common-law trespassory test," a "search occurs when the government

'physically occupie[s] private property for the purpose of obtaining information,'" while "'engag[ing] in conduct not explicitly or implicitly permitted' by the property owner." *Id*. & n.3 (quoting *United States v. Jones*, 565 U.S. 400, 404 (2012); *Jardines*, 569 U.S. at 6 (2013)).  Second, under the reasonable-expectation-of-privacy test, a "search occurs when the 'government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Id.* at 823 (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).  Both tests exist side by side and either test can be used to determine whether a search took place.  *Id.*  And if either test is satisfied, "[a]bsent a warrant or consent or exigent circumstances," the search is unreasonable under the Fourth Amendment.  *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018).

Here, we conclude that the deputy's search violated the Fourth Amendment under both the common-law trespassory test and the reasonable expectation of privacy test.

## 1.

## Physical Trespass Test

"At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961) (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765)).  This protection extends beyond the walls of the home—the curtilage is treated as "part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *Jardines*, 569 U.S. at 6).  Simply, the home and its "immediately surrounding" areas are so highly valued that they are afforded special constitutional protection.  *Id*. (simplified).  That's because the curtilage is linked to the

"physical[] and psychological[]" protection of the family and personal privacy. *Id*. (simplified). To delineate between areas considered "part of the home itself" and those areas that do not receive Fourth Amendment protection, the Supreme Court has long distinguished "what [its] cases call the curtilage" from "open fields." *Jardines*, 569 U.S. at 6. Evaluating this distinction, which "is as old as the common law," Justice Holmes concluded that Fourth Amendment protection does not "extend[] to the open fields." *Hester v. United States*, 265 U.S. 57, 59 (1924).

Drawing on Justice Holmes's *Hester* common-law distinction, the Court has continually reaffirmed that curtilage—"the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life'"—is "considered part of [the] home" and warrants Fourth Amendment protection. *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). And at common law, the Court said, curtilage had been defined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.*

*United States v. Dunn*, 480 U.S. 294 (1987), is the next stop on our review of curtilage jurisprudence. While reiterating curtilage's common-law origins, *Dunn* offered "four factors" to determine the reach of the curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. Like other multi-factor tests, the Court warned it should not be "mechanically applied" and that the factors are only a

"useful analytical tool[]" to determine the "centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*. In that case, the Court had "little difficulty" deciding that a barn 50 yards away from a fence surrounding a ranch house and 60 yards from the house itself was outside the curtilage. *Id*. at 301–02.

This is where *Jardines* comes in. *Jardines* dealt with a drug-sniffing dog on the front porch of a home. After local police received a tip that marijuana was being grown at the home, two officers and a drug-sniffing dog visited the home. *Jardines*, 569 U.S. at 3–4. Once they approached the front porch, the dog started to react to an odor. *Id*. at 4. It eventually went onto the porch and sniffed at the base of the front door and alerted to the smell of narcotics. *Id*. Officers then applied for a warrant and discovered marijuana inside the home. *Id*.

The question in *Jardines*: was the front porch curtilage? The Supreme Court viewed the answer as "straightforward." *Id.* at 5. The Supreme Court did not specifically resort to the *Dunn* factors in answering this question. But it reasoned that because "[t]he officers were gathering information in an area . . . immediately surrounding [the] house," it was considered "curtilage of the house" and thus entitled to Fourth Amendment protection. *Id.* at 5–6. The Court made clear: "the area immediately surrounding and associated with the home" is curtilage and "part of the home itself for Fourth Amendment purposes." *Id.* at 6 (simplified). And "the boundaries of the curtilage," the Court observed, are "familiar enough that it is 'easily understood from our daily experience.'" *Id.* at 7 (quoting *Oliver*, 466 U.S. at 182 n.12).

Having concluded that "the officers' investigation took place in a constitutionally protected area," the Court then considered whether the officers' action was an "unlicensed physical intrusion." *Id.* Here, the Court explained that "[a] license may be implied from the habits of the country." *Id.* at 8 (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). The Court acknowledged that visitors have "implicit license" to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* But the Court said that "no customary invitation" exists to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence . . . ." *Id.* at 9. In deciding on the "scope of license" to enter the property, the Court looked to both the "particular area" intruded on and the visitor's "specific purpose." *Id.* In that case, the Court concluded, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.*

*Collins* further cemented the Fourth Amendment's protection of the areas immediately surrounding the home. The Court had to decide whether the search of a motorcycle on a home's "driveway enclosure" constituted a search under the Fourth Amendment. *Collins*, 584 U.S. at 593. This area was at the "top portion of the driveway," and "enclosed on two sides by a brick wall about the height of a car and on a third side by the house." *Id.* A visitor to the home "would have to walk partway up the driveway" to get to the front door "but would turn off before entering the enclosure . . . ." *Id.* Comparing the area to a "front porch, side garden, or area outside the front window," the Court concluded that the "driveway enclosure . . . constitutes an area adjacent to the home and to which the activity of home life extends, and so

is properly considered curtilage." *Id*. at 593–94 (simplified). And so, the officer's search of a motorcycle invaded the defendant's "Fourth Amendment interest in the curtilage of his home" and was not justified by the automobile exception to the Fourth Amendment could not save the search. *Id.* at 594.

## 2.

## Chong's Curtilage

Having reviewed this history of curtilage and the efforts the Supreme Court has taken to delineate its boundaries, we return to the facts here.

At around 9 p.m., sheriff's deputies executed a search on Chong's home. This decision was made after Tran, a known state parolee, entered the house and the garage door was opened. A sheriff's deputy crossed over a neighbor's retaining wall and traversed the driveway toward the garage entrance, taking a route about halfway up the driveway to the home and not near the sidewalk. As the deputy approached the open garage door, he observed Tran drop a clear plastic baggie containing methamphetamine. At the time he saw this, the deputy was standing directly to the left of the open garage door and, by his own testimony, only about one foot from the garage threshold.

Given Supreme Court guidance on the boundaries of curtilage, we easily conclude that the deputy was standing within the curtilage of Chong's home when he saw Tran toss the drugs. At just one foot away from the garage door entrance, this area was "immediately surrounding and associated with the home." *Jardines*, 569 U.S. at 6 (simplified).

Some courts, including courts applying *Dunn*, have had to grapple with the potentially thorny question of how close is close enough to be "immediately surrounding" the home. *See, e.g.*, *United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) (explaining that a trash can was outside the home's curtilage when it was on a strip of grass beyond an apartment's patio, and "at least 20 feet from" the apartment's backdoor, where it was located in an apartment complex with shared sidewalks); *United States v. Carloss*, 818 F.3d 988, 1005 n.1 (10th Cir. 2016) (Gorsuch, J., dissenting) ("At common law the curtilage was far more expansive than the front porch, sometimes said to reach as far as an English longbow shot—some 200 yards—from the dwelling house."); *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 561 (6th Cir. 2018) (concluding that an area five to seven feet from the home constituted curtilage); *French v. Merrill*, 15 F.4th 116, 128–29 (1st Cir. 2021) (observing that a close enough distance to knock on the front door or window of a home was within its curtilage).

Here, under any conception of curtilage, *one foot* from the garage door entrance of a single-family home on a residential street is surely within the curtilage of that home. While the driveway wasn't enclosed, the officer's close proximity to the garage door entrance here more than makes up for that. As the Sixth Circuit put it, "[e]ven when the borders are not clearly marked, it is 'easily understood from our daily experience' that an arm's-length from one's house is a 'classic exemplar of an area adjacent to the home and "to which the activity of home life extends."'" *Morgan*, 903 F.3d at 561 (quoting *Jardines*, 569 U.S. at 7). Indeed, entering within one step of an open garage door to investigate is comparable to trawling through the "front porch, side garden, or area 'outside the front window'"—

which are all considered protected curtilage. *See Collins*, 584 U.S. at 593 (simplified).

And just like in *Jardines*, the deputy had no license to be there. If going to the front porch to search with a police dog violates "customary invitation," *Jardines*, 569 U.S. at 9, then climbing over a neighbor's retaining wall at night, covertly traversing the driveway, and surprising the inhabitants at an open garage door also lacks license. Even if it were the case that a visitor, seeing a garage door open with someone inside, may approach the home by walking from the cul de sac directly up the driveway to the garage, there's certainly no license—implied or otherwise—to sleuth around the homeowner's garage door at night and startle the occupants by approaching from the side. Simply, no "background social norm[]" invites a visitor to enter to within inches of the garage door to conduct a search in the manner deputies did here. *Id*.

Of course, this is not to say that the deputies were required to "shield their eyes" from the open garage door while on "public thoroughfares." *Id.* at 7 (simplified). If the deputy instead had been on the sidewalk when he observed Tran throw the drugs, this would be a much different case. But whatever "leave" the deputy had to "gather information" while on public ground was "sharply circumscribed" once he entered the property by leaping over the fence of an adjoining property and came within a foot of the garage door opening. *Id.* After all, there's a huge difference between "the ability to *observe* inside the curtilage with the right to *enter* the curtilage without a warrant." *United States v. Perea-Rey,* 680 F.3d 1179, 1186 (9th Cir. 2012) (emphasis added).

Thus, under the common-law trespass test, the deputy stood on the curtilage of Chong's home as he investigated what was happening inside the garage and did so without any express or implied license. Because that constitutes a search of a constitutionally protected space without a warrant, consent, or exigency, it was unreasonable here.

**3.**

### Reasonable Expectation of Privacy

We get to the same place through the reasonable-expectation-of-privacy test. As we've said before, "curtilage is important because it extends to a larger area the right to privacy a person enjoys inside the home." *United States v. Gorman*, 104 F.3d 272, 274 (9th Cir. 1996). While an "individual may not legitimately demand privacy for activities conducted out of doors in fields," such an expectation of privacy may exist in "the area immediately surrounding the home." *Id*. (quoting *Oliver*, 466 U.S. at 178); *see also Wattenburg v. United States*, 388 F.2d 853, 857 (9th Cir. 1968) (in addition to examining whether a search was on the curtilage, looking at whether a search "adjacent to a house is constitutionally forbidden [because] it constitutes an intrusion upon what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public"). Thus, even under the reasonable expectation of privacy test, "[t]he curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986).

The district court reasoned that "[t]here clearly could be no reasonable expectation of privacy with respect to the

interior of the garage or the driveway leading to the garage, when the garage doors were open." But this ignores the manner in which the deputy approached the garage. He didn't walk up from the sidewalk, where he would be spotted immediately and from where guests typically enter the property. Instead, the deputy jumped the side-retaining wall of the house, hugged the front side of the house (likely to keep out-of-sight of anyone in the garage), and suddenly appeared a foot away from the open garage door. Such an approach to the threshold of the garage, late at night, would certainly surprise any person in the garage, like Tran here. Just because the garage entrance was exposed to the public for a period doesn't give law enforcement license to treat it as a public thoroughfare.

Thus, based on these facts, both the subjective and objective elements of the reasonable-expectation-of-privacy test are met here. The reasonable-expectation-of-privacy test also leads us to conclude there was a Fourth Amendment violation here.

## 4.

## Good Faith and the Parole Exception

Having concluded that deputies violated the Fourth Amendment in searching Chong's curtilage, we are still left to decide whether the exclusionary rule would apply here. *Herring v. United States*, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies."). Only if the exclusionary rule applies would there be prejudice under *Strickland*.

The government appeals to the good-faith exception to the exclusionary rule based on Tran's parole status. As a state parolee, Tran was subject to having his "residence and any property under [his] control" searched without a warrant at any time. 15 Cal. Code Regs. § 2511. But for the parole-search exception to apply, "law enforcement officers must have *probable cause* to believe that the parolee is a resident of the house to be searched." *Grandberry*, 730 F.3d at 973 (emphasis added); *see also Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc) ("[B]efore conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched."); *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006). And the district court concluded that probable cause was missing here. As the district court said, there was an insufficient showing "for law enforcement to have reached a conclusion that [Chong's house] was [Tran's] residence." While Tran was seen entering Chong's house and opening the door, he was not observed staying there overnight. The government doesn't challenge this ruling.

The government argues that the officers acted in reliance on California law, which required officers to have a "reasonable belief" that Tran lived at Chong's residence in order to conduct a valid parole search. *See People v. Downey*, 198 Cal. App. 4th 652, 662 (2011) ("[A]n officer . . . conducting a probation or parole search may enter a dwelling if he or she has only a 'reasonable belief,' falling short of probable cause to believe, the suspect lives there and is present at the time."). Even assuming this case law could provide the basis for a good faith argument, and further assuming California courts in fact apply a lower standard (and that the government did not waive this issue), the

government's argument still fails. The deputies' investigation into whether the residence was Tran's was meager, consisting primarily of the federal agents' assumptions and deputies' observation of Tran arriving at the home the night of the raid. Deputies took no steps to confirm their belief that Tran resided at the house, even easily available ones, such as calling Tran's parole officer. On the record before us, we cannot say that there was sufficient evidence to support an objectively reasonable belief the home was Tran's.

Likewise, whether the sheriff's deputy subjectively and in good faith believed he stood outside the curtilage doesn't change our analysis. As we have said, "we [do] no[t . . . ] rely on the good faith belief of law enforcement officers in our analysis of whether an incursion into the curtilage . . . violates the Fourth Amendment." *Perea-Rey*, 680 F.3d at 1187. This is not a case of an officer acting "in strict compliance with then-binding Circuit law and was not culpable in any way." *Davis v. United States*, 564 U.S. 229, 239–40 (2011) (declining to apply the exclusionary rule when an officer followed binding circuit precedent later reversed as unconstitutional). While the government contends that the search was before *Jardines* and so it was less clear that the deputy was on the curtilage, no binding case pre-*Jardines* would have affirmatively permitted the deputy to enter within one foot of a garage door entrance in the surreptitious manner, and with the investigatory purpose, that he did here. And even before *Jardines*, authorities already showed that the "area immediately surrounding the home" was protected from search, absent consent, a license, and so on. *See Oliver*, 466 U.S. at 178.

For these reasons, the search cannot be justified under the good faith exception to the exclusionary rule.

* * *

Thus, the sheriff's deputy violated the Fourth Amendment by entering Chong's curtilage without warrant or an exigency.  And the government does not dispute that the fruit of the poisonous tree would apply to all the evidence discovered after the deputy observed Tran throw the baggie of methamphetamine.  Because the exclusionary rule would have been appropriate for all this evidence, "there is a reasonable probability that the verdict would have been different" given the probable exclusion of the drugs, guns, and money.  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  Thus, "actual prejudice" has been demonstrated.  *Id*.

## B.

## Deficient Performance

Having found prejudice, *Strickland* next requires a petitioner to establish that counsel's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  In considering this prong, courts "must apply a 'strong presumption' that counsel's representation was within the wide range of reasonable professional assistance." *Premo*, 562 U.S. at 121 (simplified).  This objective standard of reasonableness sets a high bar.  Counsel's performance must have done more than just "deviated from best practices or most common custom."  *Id.* at 122.  It must have essentially "amounted to incompetence under prevailing professional norms."  *Id.* (simplified).  As stated earlier, the "relevant question" here is whether "no competent attorney would think a motion to suppress would have failed."  *Id.* at 124.

We analyze Chong's and Tran's counsel's performance separately.

## 1.

### Chong's Counsel's Performance

As we have already established, if a motion to suppress was brought by Chong's counsel arguing that the sheriff's deputy violated the Fourth Amendment when he observed Tran throw the baggie of drugs, it would have succeeded and it would have resulted in the exclusion of the fruits of that search. Chong's counsel also states he had no "strategic, tactical, or legal decision" in failing to make this motion.

We conclude that Chong's counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. While we do not evaluate counsel's performance with perfect 20/20 hindsight, *see id.* at 689, the curtilage argument here was not merely a winner but an obvious argument that counsel clearly should have made.

The curtilage argument should have been well-known to Chong's counsel. Back in 1968, we considered it well-established that "[t]he protection afforded by the Fourth Amendment, insofar as houses are concerned, has never been restricted to the interior of the house, but has extended to open areas immediately adjacent thereto." *Wattenburg*, 388 F.2d at 857. In 1984, the Court explained that the area "immediately surrounding and associated with the home" was protected as "part of home itself." *Oliver*, 466 U.S. at 180. And although the particularly strong *Jardines* opinion was issued after the July 2012 search of Chong's home, it was decided before the motion to suppress hearing.

*Jardines* clearly reinforced the Fourth Amendment's protections for the curtilage and provided counsel with clear grounds for a motion to suppress. Chong's counsel was thus

plainly deficient for failing to raise such an obvious Fourth Amendment objection in the immediate wake of a directly on-point Supreme Court decision. "[T]he Fourth Amendment's protection of curtilage has long been black letter law." *Collins*, 584 U.S. at 592. And failing to raise a black-letter-law objection that will dispose of a client's case is at the heart of *Strickland*'s deficient performance. Even if counsel was not deficient for failing to argue this point under a reasonable-expectation-of-privacy theory, *Jardines* provided a clear pathway to suppression. Although *Strickland* instructs us be "highly deferential" when evaluating attorney performance and to resist "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, given these facts, it was unreasonable for Chong's counsel to fail to bring a motion to suppress.

## 2.

### Tran's Counsel's Performance

Tran's counsel's performance is a different story. For Tran to claim that his counsel was ineffective, he needed to establish standing to object to the search of Chong's curtilage in the first place. Otherwise, any motion to suppress would have failed.

To have standing to challenge an illegal search, "a defendant must show that he personally had a property interest protected by the Fourth Amendment that was interfered with." *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022) (simplified). Tran lacks that. He did not own the home. He did not pay rent there. And while he opened the door to the house without being let in, he did not live there or possess a key to the house. As Chong himself stated, Tran "does not live with me" and only "visit[s] me from time to time." Thus, it wasn't Tran's curtilage that was invaded

the night of the search, and so he lacks standing to challenge the search on that basis.

A defendant can also challenge an illegal search if he had "a reasonable expectation of privacy that was invaded by the search." *Fisher*, 56 F.4th at 686 (simplified). To establish standing under this approach, the defendant has the burden of showing, "under the totality of the circumstances, the search . . . violated [his] legitimate expectation of privacy." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1026 (9th Cir. 2010) (simplified). Generally, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (denying Fourth Amendment protection to visitors who had gathered to package and distribute drugs). So when a defendant "used a friend's apartment while the friend was away, had a key to the apartment, kept some clothes there, and slept there 'maybe a night,'" the defendant had Fourth Amendment standing. *Gordon v. Duran*, 895 F.2d 610, 614 (9th Cir. 1990) (simplified). On rare occasions, being an overnight guest is unnecessary for standing if the defendant otherwise had "joint control and supervision of the place searched." *United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir. 1984). These cases are rare and require a "formalized, ongoing arrangement" of "joint control." *Reyes-Bosque*, 596 F.3d at 1028 (simplified). On the other hand, being on a premise solely for "a commercial or possibly criminal purpose" isn't sufficient to establish a reasonable expectation of privacy. *United States v. Paopao*, 469 F.3d 760, 764 (9th Cir. 2006); *see also United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995) (holding that using another's house as a "stash house" for drugs does not establish a legitimate expectation of privacy).

So it would be one thing for Chong—as the owner of the house—to claim an expectation of privacy in the area outside his garage; it is another for a visitor—like Tran—to have such an expectation. In Tran's declaration before the district court, he conceded that he did not live at Chong's house and was only visiting the home. The record does not show that Tran had an overnight bag with him or any other indication of staying overnight. Indeed, in his declaration, Tran said nothing about intending to sleep over that evening. And Tran acknowledged that the search occurred shortly after he arrived at the home, so he couldn't have established an expectation of privacy from a long stay there.

While Tran alleges his trial counsel was ineffective for failing to introduce declarations from three residents of Chong's home in support of his standing, the declarations would not have changed the outcome. The declarations, from Tran's niece, his niece's husband, and Chong's girlfriend who all lived at the home, don't establish that Tran had a reasonable expectation of privacy in the garage or its immediate surroundings. The declarations explain that Tran never lived at the house, although he was welcome to visit and did so often. He would come over for holidays, for poker once a week, and for dinner two or three nights a week. While Tran at times slept overnight at the house, the declarations do not state he was planning to do so on the night of the search. Instead, about twice a month, Tran would stay overnight if he "was too tired to drive home and/or because he had been drinking alcoholic beverages and it was unwise to drive home." And even when Tran spent the night at the house before, he would sleep in a guest room or on the living room couch. So nothing in the declarations show that he had a privacy interest in the garage or the curtilage outside the garage. The declarations also do not

alter that he had no key to the house, stored no personal effects in the house, and possessed no rights in the house. *See Davis*, 932 F.2d at 757. Quite simply, the facts in the declaration don't change the standing analysis.

If anything, strategic reasons existed for *distancing* Tran from Chong's home. Establishing Tran's standing would have strengthened the government's argument that the parole-search exception applied. Recall the district court first believed that the search was justified by the parole-search exception based on Tran's parole status and presence at the home. Only after *Grandberry* did the district court believe that law enforcement did not have probable cause to believe that Tran resided at the home. But submitting declarations that would have *increased* Tran's ties to the house risked providing the probable cause necessary to meet the parole-search exception and justify the search. So counsel could have understood that submitting the declarations may have achieved a Pyrrhic victory—successfully asserting standing but risking a finding that the parole search was proper. That type of judgment call is not deficient performance. *United States v. Fredman*, 390 F.3d 1153, 1157 (9th Cir. 2004).

## III.

### Conclusion

To sum up: the sheriff's deputy overstepped his authority. He intruded on the curtilage of the home without a license and violated the reasonable expectation of privacy Chong had on his property. For failing to see that law enforcement had so gravely crossed a line, Chong's counsel provided ineffective assistance of counsel by not moving to suppress on that basis. So we reverse the denial of Chong's § 2255 motion and direct that it be granted. But because

Tran cannot establish standing to challenge the search—even with the unsubmitted declarations—his counsel's performance wasn't deficient, and we affirm the denial of his § 2255 motion.

**AFFIRMED IN PART AND REVERSED IN PART AND REMANDED.**

BUMATAY, Circuit Judge, concurring:

Few things are more serious than an overstep of government power. And here, we have a literal one. When law enforcement officers entered the property adjoining the defendant's house at night, jumped the neighbor's side-retaining wall, crossed the defendant's front yard along a partially fenced-off front porch, and arrived just one foot away from the open garage door of the defendant's private home—all without a warrant—they crossed a line. And that line was real.

The Fourth Amendment safeguards the people from unreasonable government searches. Absent some well-delineated exceptions, it requires searches to be supported by a warrant and probable cause. That government officers may not intrude on the sanctity of the home—either by physically trespassing or by invading the owner's reasonable expectation of privacy—is central to the Fourth Amendment. That protection isn't limited to the four corners of the home. It can also extend to the areas immediately surrounding the home—known as the curtilage. Heightened protection for curtilage is longstanding and predates even the Founding of this country, tracing its roots to the English common law.

The Los Angeles Sheriff's Department deputies violated Harson Chong's Fourth Amendment rights when they entered the curtilage of his home without a warrant or an exigency. Thus, Chong's counsel was ineffective for failing to bring a motion to suppress based on a common-law trespass theory of the Fourth Amendment right. As the per curiam opinion establishes, a common-law trespass challenge was a clearly winning argument under modern precedent. Even so, the government counters that the common-law trespass thread of the Fourth Amendment is a relatively new phenomenon and so it was excusable for Chong's counsel to miss it. But that's wrong. As set forth below, protection against trespassing on curtilage is deeply rooted in our nation's history. So it should have been obvious even before more recent Supreme Court cases' articulation of the Fourth Amendment right.

## I.

The Fourth Amendment, "at [its] very core" articulates how a "man [can] retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961) (citing *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765)). As understood at English common law, "the property of every man [is] so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law." *Entick*, 95 Eng. Rep. at 817. And among property, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). As Coke observed, "a man's house is his castle, *et domus sua cuique est tutissimum refugium*"—each man's home is his safest refuge. 3 Edward Coke, Institutes of the Laws of England 161 (1797). This ancient protection for the home is

at the heart of the Fourth Amendment common-law trespassory test.

Protection of the curtilage extends beyond just the four walls of the home. Indeed, curtilage is "part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *Jardines*, 569 U.S. at 6). And so the home and "immediately surrounding" areas receive special constitutional protection. *Id.* (simplified). That's because the curtilage is linked to the "physical[] and psychological[]" protection of the family and personal privacy. *Id.* (simplified). After all, the Fourth Amendment "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or if "the police could enter a man's property to observe his repose from just outside the front window." *Jardines*, 569 U.S. at 6.

Like much of our law, we inherited protection of the curtilage from the English common law. *See Oliver v. United States*, 466 U.S. 170, 180 (1984) ("[T]he common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home." (simplified)). And the boundaries of curtilage served an important legal purpose—it was "an ancient English law term used to mark off an area outside the walls of the home as being within the geographic area in which theft at night amounts to burglary." *United States v. Van Damme*, 48 F.3d 461, 464 (9th Cir. 1995). As Blackstone said, "if the barn, stable, or warehouse be parcel of the mansionhouse, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." IV Blackstone's Commentaries 225 (1769).

So at English common law, criminal mischief in building structures within the curtilage was considered "burglary" even if not occurring within the home. *See, e.g.*, *Clapham's Case*, 168 Eng. Rep. 200–01 (1830) (explaining a "[p]risoner was convicted" for "housebreaking" into the "curtilage of the dwelling-house" when he broke into the door of an out-house connected to a "dwelling-house" by a wall). Curtilage was also a common-law arson concept. *See* John Poulous, *The Metamorphosis of the Law of Arson*, 51 Mo. L. Rev. 295, 300 (1986) (describing how "burglary and arson were both offenses against the security of the habitation" and "for the most part, shared a common definition of 'dwelling house'"); *see also United States v. Cardish*, 145 F. 242, 247 (E.D. Wis. 1906) (relying on an English burglary case, *Rex v. Stock*, 168 Eng. Rep. 751 (C.P. 1810), related to curtilage to uphold an arson conviction); 1805 Mass. Stat. Act 7, § I (explaining that an individual could be punished for "burning, *in the night time*, any public building; or building, within the curtilage of a dwelling-house"), *as reprinted in* 1 William Charles White, A Compendium and Digest of the Laws of Massachusetts 99 (1809).

At common law, the boundaries of curtilage were well understood. One early definition identified curtilage as: "a Garden, Yard or Field, or other piece of Ground lying near, or belonging to a Messuage[1] . . . . So that in effect it is a Yard or a Garden belonging to a House." *Curtilage*, Nomothetas, the Interpreter: Containing the Genuine

---

[1] A "messuage" is defined as "a Dwelling-house, with some Land adjoining, assigned to the Use thereof." *Messuage*, New-Law Dictionary: Containing the Interpretation and Definitions of Words and Terms Used in the Law (1729).

Signification of Such Obscure Words and Terms (1684). Other early definitions used similar language. *See, e.g.*, *Curtilage*, Law-Dictionary and Glossary, Interpreting Such Difficult and Obscure Words and Terms (3d ed. 1717) (defining "curtilage" as a "yard, backside, or piece of Ground lying near a Dwelling-house where they sow Hemp, Beans, and such like"); *Curtilage*, Universal Etymological Dictionary: Comprehending the Derivations of the Generality of Words in the English Tongue (3d ed. 1726) (defining "curtilage" as a "piece of Ground, Yard, or Garden Plat belonging to, or lying near a House").   And in dictionaries more contemporaneous to the Founding, the definition remained unchanged. *See Curtilage*, New Law Dictionary (1792) (defined as "a courtyard, backside, or piece of ground, lying near and belonging to an house").

And back then, the line between curtilage and opens fields was more discernible than it is in this country today. As the Virginia Supreme Court observed,

> In England the curtilage seems to have included only the buildings within the inner fence or yard, because there, in early times, for defense, the custom was to inclose such place with a substantial wall. In this country, however, such walls or fences, in many cases, do not exist, so that with us the curtilage includes the cluster of buildings constituting the habitation or dwelling place, whether inclosed with an inner fence or not.

*Bare v. Commonwealth*, 94 S.E. 168, 172 (Va. 1917); *see also* Brendan Peters, Fourth Amendment Yard Work: Curtilage's Mow-Line Rule, 56 Stan. L. Rev. 943, 952

(2004) ("In England, it was relatively simple to locate the curtilage boundary because it was collinear with the wall that surrounded most dwellings."); Andrew Guthrie Ferguson, Personal Curtilage: Fourth Amendment Security in Public, 55 Wm. & Mary L. Rev. 1283, 1314 (2014) (explaining that British property law established physical boundaries between properties, with boundaries traditionally including an enclosure with a main house and grounds and "[t]he curtilage area was understood as a subset of this property line," usually marked by a wall or a fence).

The Supreme Court first recognized the protection of curtilage more than a hundred years ago. Back in 1921, the Court reversed a conviction based on the search of the defendant's house and "store 'within his curtilage.'" *Amos v. United States*, 255 U.S. 313, 314–15 (1921) (describing how government revenue officers found illegal whisky—"blockade whisky"—in the defendant's store and under his bed at home). Without distinguishing between the two locations, the Court concluded that the search of the defendant's "home . . . without warrant of any kind" was "in plain violation" of the Fourth Amendment. *Id*. at 315–16.

Likewise, in another whiskey bootlegging case, Justice Holmes traced the Fourth Amendment protection of the home to Blackstone's distinction between "open fields" on the one hand and "the house" on the other. *See Hester v. United States*, 265 U.S. 57, 59 (1924) (citing 4 Blackstone, Commentaries §§ 223, 225–26, which discussed the protection of structures within the "curtilage"). In evaluating this distinction, which "is as old as the common law," Justice Holmes concluded that Fourth Amendment protection does not "extend[] to the open fields." *Id*.

This history all leads to our current understanding of curtilage.  In modern times, the Court has affirmed that the Fourth Amendment protects not only the home but more expansively "the area immediately surrounding the home." *Oliver*, 466 U.S. at 178.[2]  Given the historical underpinnings of modern curtilage law, and the longstanding regard our courts and the American tradition place on the sanctity of the home, it is even clearer that Chong's counsel provided ineffective assistance of counsel by not moving to suppress.

I concur in full with the per curiam opinion.

---

[2] Some scholars debate whether the Supreme Court has overly expanded the protection of "curtilage," suggesting that the common-law protection applied only to structures within the curtilage—not the space itself.  *See, e.g.*, Peters, Fourth Amendment Yard Work, 56 Stan. L. Rev. at 955 ("Modern curtilage is a significant extension of the understanding of the Fourth Amendment because after *Oliver*, if officers without a warrant enter the curtilage (read: yard or lawn) of the house, not just structures within the yard, any evidence found is subject to the exclusionary rule."); Chad Flanders, *Collins* and the Invention of "Curtilage," 22 U. Pa. J. Const. L. 755, 758 (2020) ("In turning the curtilage from a *space* that designates buildings that deserve protection into its own protected *place*, the Court has falsely elevated the curtilage, giving it a meaning that extends past what the text of the Fourth Amendment can reasonably bear.").  But in the end, this debate doesn't matter for our purposes because the Supreme Court has clearly spoken.  And under its rulings, areas "immediately surrounding and associated with the home" are considered "part of the home itself for Fourth Amendment purposes." *Collins*, 584 U.S. at 592 (simplified).