Filed 12/26/25  P. v. Alford CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HOOVER CHEN ALFORD,<br><br>Defendant and Appellant. | F088420<br><br>(Super. Ct. No. F24901375)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Christopher Stansell and Martin Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and William C. Moine, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Hoover Chen Alford appeals after pleading no contest and being sentenced on 18 counts that generally fall within the ambit of identity theft. Appellant contends the trial court incorrectly denied his motion to quash the warrant leading to the discovery of the principal evidence used to support the charges against him. Appellant also argues that one condition of his supervision constitutes an improper delegation of judicial authority. For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

As this appeal principally turns on the search warrant issued for appellant's home, we recount the relevant facts as disclosed in the application for that search warrant.

In June 2019, a Fresno County Sherriff's Office task force began investigating fraudulent purchases of several vehicles from local businesses in Fresno County. This investigation led to the arrests of several suspects and the discovery of multiple fake driver's licenses and other financial documents used in the purchases of the vehicles. One of these arrests involved a person named Noah Manley who used a fake driver's license with his own picture but a different name to rent a truck from U-Haul.

When interviewed, Manley claimed the license had been made by appellant and that appellant "was actively using identity theft to purchase and rent vehicles under false pretenses." Manley alleged these activities included purchasing a blue Dodge Challenger, a white Dodge Durango, a black Chevrolet Camaro, and an Audi sedan of an unknown color. Manley claimed that only the blue Dodge Challenger remained in appellant's possession.[1]

Based on this information, Fresno County Sheriff's Office Detective John Capriola went to appellant's known address on December 18, 2019. There, Capriola observed "a newer blue Dodge Challenger parked in the driveway of the residence." The

---

[1]     As part of the disclosure on this point, the affidavit referred to an attachment C, which was sealed by the trial court. Appellant requests this court review that attachment to determine whether it provides sufficient additional facts to support the warrant.

car was backed into the driveway and parked in front of a gate leading into the backyard. It was roughly 15 feet from the sidewalk. The vehicle did not have a front license plate, but Capriola could see paperwork affixed to the front windshield.

Capriola approached the vehicle to view the paperwork and discovered it contained the vehicle's VIN number. Capriola used to this VIN number to determine the car was not registered but had been sold by Carvana on August 10, 2019. A subsequent call to Carvana revealed the car had been purchased by someone claiming to be Nicholas Sanders. When the car was delivered, this person produced a driver's license with the same name. The car was purchased through online financing with an $800 deposit but delivered before the deposit cleared. After delivery, the transaction for the deposit was rejected by the bank. Carvana's investigation revealed Sanders had been the subject of identity fraud and had not purchased the car. Capriola confirmed this by contacting Sanders who affirmed he had been the victim of identity theft and had not purchased the vehicle.

Capriola's request to search appellant's home for evidence related to identity theft and drug activities was approved. The subsequent search discovered appellant in possession of multiple instruments related to the process of making fake identification cards, several fake identification cards, multiple vehicles including the Dodge Challenger, and additional evidence of identity theft and fraudulent purchases. After his arrest, appellant made several admissions, including that he made a fake identification, purchased the Dodge Challenger, and assisted two others in fraudulently purchasing or renting vehicles.

Appellant was subsequently charged by information of 18 counts related to his actions. These included: four counts of identity theft (Pen. Code,[2] § 530.5, subd. (a); counts 1, 4, 10, 13); six counts alleging the fraudulent sale, transfer, or conveyance of

---

[2] Undesignated statutory references are to the Penal Code.

3.

another's identifying information (§ 530.5, subd. (d)(1); counts 2, 5, 6, 8, 11, 12); one count of attempting to obtain money, labor, or property by false pretenses (§§ 664, 532, subd. (a); count 3); two counts of receiving a stolen vehicle (§ 496d, subd. (a); counts 7, 9); and one count each of possessing a forged government identification (§ 470b; count 14), unlawfully accessing card activity (§ 484i, subd. (c); count 15), counterfeiting a public seal (§ 472; count 16), forgery (§ 475, subd. (b); count 17), and possessing personal identifying formation for 10 or more other persons with intent to defraud (§ 530.5, subd. (c)(3); count 18).

Appellant moved to suppress the evidence discovered and to traverse and quash the search warrant. The trial court heard and denied appellant's motion.

Relevant to this appeal, appellant argued that the warrant was improper because Capriola entered onto private property to obtain the VIN number of the Dodge Challenger. In support of his motion to traverse, appellant provided three photographs of his residence, showing the general location of the vehicle and the layout of the driveway and property. The court rejected appellant's arguments.

In ruling the warrant was properly issued, the trial court found that sealed attachment C was not necessary to the warrant's determination. The court next noted that the police had been provided information about the making of fake identification cards and the fraudulent purchase of a blue Dodge Challenger by Manley, after arresting him. The court then summarized appellant's argument that entry onto his driveway to view the paperwork for the blue Dodge Challenger found when Capriola visited the location constituted an illegal search because the driveway qualified as curtilage of the home. The court noted the guidance provided in *United States v. Dunn* (1987) 480 U.S. 294 (*Dunn*) before finding all relevant factors lead to a conclusion the driveway was not a protected space.

4.

The court explained there is no reasonable expectation of privacy of the VIN number in this case and that the court was not faced with a situation where the subject vehicle "was parked in a garage, or behind a fence, or in a backyard." Rather, the car remained on a driveway, mere feet from the sidewalk. The court further found that even if the vehicle was within the curtilage of the property, the VIN number would have been inevitably discovered because Manley's statement provided independent probable cause for a warrant. Turning next to the pictures offered in support of the motion to traverse, the court agreed the pictures showed one could not read the VIN number from the street but explained that this did not show any misleading facts in the affidavit. Accordingly, the court found no reason to set aside the affidavit or to quash the warrant.

Following this ruling, appellant pleaded no contest to all 18 counts based on a court-indicated offer of an eight-year split sentence, with five years in Fresno County jail and three years on mandatory supervised release. Appellant was subsequently sentenced in line with this offer. As part of his supervised release, the court imposed a standardized term requiring appellant to "participate in all treatment program assessments as directed by the Court or your probation officer, and any recommended treatment programs." The minute order requires a "Program Type as directed by Probation" where the normal options are "In Patient" or "Out Patient." Appellant did not object at the time.

This appeal timely followed.

### DISCUSSION

Appellant challenges the warrant issued in this case on the ground it was tainted by an unlawful entry onto his curtilage and argues the affidavit supporting the warrant lacks probable cause without evidence obtained from this intrusion. Relatedly, appellant argues his motion to traverse, which relied on additional information about the property, should have been granted even if the warrant was not quashed solely based on the challenge to the affidavit and otherwise requests this court review sealed attachment C to

5.

the search warrant affidavit.  Finally, appellant challenges a condition of his supervised release that requires him to participate in recommended treatment programs and preliminary assessments on the ground its breadth impermissibly delegates judicial authority to a probation officer.  We consider first the challenges to the search warrant before reviewing sealed attachment C and the challenge to the supervised release condition.

### *Capriola's Affidavit Supports the Search Warrant*

Appellant's primary argument for excluding evidence discovered in the search of his home turns on whether the Dodge Challenger Capriola searched to obtain information supporting the warrant was within the curtilage of his home.  Appellant contends the warrantless search of the Dodge Challenger to obtain its VIN number violated his Fourth Amendment rights because the car was within the home's curtilage.  He further argues that if that fact is not evident from the four corners of the affidavit, it is shown by the pictures submitted with his motion to traverse.  The People argue the car was not within the home's curtilage, but even if it were, Capriola could have relied on the implied license of a visitor to approach the car.

*Standards of Review and Applicable Law*

"[T]he Fourth Amendment's protection of curtilage has long been black letter law."  (*Collins v. Virginia* (2018) 584 U.S. 586, 592 (*Collins*).)  Derived from the core protection of one's home, "the Court considers curtilage—'the area "immediately surrounding and associated with the home" '—to be ' "part of the home itself for Fourth Amendment purposes." ' " (*Ibid.*)  In contrast, open fields—those areas surrounding but not so intimately associated with the home as to "provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance"—do not warrant the Fourth Amendment protections that attach to the home.  (*United States v. Oliver* (1984) 466 U.S. 170, 179–180.)  The defining line is, at its core,

whether one would have a reasonable expectation of privacy in the area. (*Id.* at p. 180; see *Florida v. Jardines* (2013) 569 U.S. 1, 7 (*Jardines*) ["This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' "].) " ' "What a person knowingly exposes to the public, even in his own home …, is not a subject of Fourth Amendment protection." ' " (*People v. Camacho* (2000) 23 Cal.4th 824, 831.)

The United States Supreme Court has identified certain factors relevant to determining whether property falls within a home's protected curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*Dunn, supra*, 480 U.S. at p. 301.) These factors are not a mechanical test, but rather relevant to properly gauging "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid.*)

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040.) " 'A search warrant obtained upon information acquired by an illegal search is itself invalid.' " (*People v. Chapman* (1984) 36 Cal.3d 98, 113, disapproved on other grounds in *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867.)

One may also seek to traverse a warrant because "the affiant deliberately or recklessly omitted material facts that negate probable cause when added to the affidavit." (*People v. Eubanks* (2011) 53 Cal.4th 110, 136.) The challenger " 'bears the burden of showing that the omissions were material to the determination of probable cause' "—i.e.,

whether the omitted facts would have any effect on the issuance of the warrant under the totality of the circumstances. (*Ibid.*) "A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause." (*People v. Scott* (2011) 52 Cal.4th 452, 484.)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

*The Driveway Was Not Within the Home's Curtilage*

Appellant contends that his private driveway, set off from the path that needs to be traversed to reach his front door and situated in front of a gate leading to a backyard detached garage, should be considered curtilage under the prevailing case law. We do not agree.

There is nothing in the existing case law that suggests a driveway is a de facto part of a home's curtilage. A modern front driveway is different from other spaces surrounding the home such as a front porch or side garden that are typically considered so intimately tied to a home to be entitled to a reasonable expectation of privacy. (But see *Collins, supra*, 584 U.S. at pp. 593–594 [enclosed portion of a driveway, separate from the typical portion of the driveway used to access the property sufficiently like a front porch, side garden, or area outside of the front window to qualify as curtilage].) Driveways are often open areas, visible to the public, and abutting public walkways and roads. They frequently, but not always, connect with the walkway to the home. They are rarely covered or blocked in a manner that would prevent access to a vehicle placed in the driveway, and they are not usually directly abutting the entrance to or a window showing

8.

the inside of one's home. They are typically used as public ingress and egress points for the property and connections from the home to one's mode of transportation.

In line with this general understanding, Capriola's affidavit supports finding that the driveway in this case was not so intimately tied to the home as to justify substantial privacy interests. Although sparse in detail, the affidavit explains Capriola "drove past the residence" and "observed a newer blue Dodge Challenger parked in the driveway of the residence. The Dodge Challenger was backed into the driveway of the residence and parked near the gate into the backyard. The vehicle did not have a front license plate and was parked approximately 15 feet from the sidewalk. From the sidewalk, I could see paperwork affixed the front of the windshield on the driver side of the vehicle."

Applying the *Dunn* factors to this disclosure does not demonstrate the area where the car was located was "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Dunn, supra*, 480 U.S. at p. 301.) The affidavit does not disclose how close the driveway was to the home but does hint that the portion of the driveway upon which the vehicle was parked was relatively close to the home, as the car was backed up to the backyard fence. With no indication this area was near the front porch, a side door, or some other intimate area of the home, this factor is neutral or only slightly in favor of finding the area curtilage. However, the remaining factors do not support a curtilage finding. As a space openly visible to the public and no more than 15 feet from the sidewalk, there is no indication the driveway is within a meaningful enclosure. Further, as an area outside of the fenced backyard and directly visible from the street, the nature of the driveway fits within the modern public space used to park vehicles and proceed into one's home. Finally, as a fully visible space, there is no indication of steps taken to protect the area from observation. For these reasons, the *Dunn* factors do not support finding the driveway is within the home's curtilage.

9.

Nor does appellant's reliance on *Jardines*, *Collins*, and *Chong v. United States* (9th Cir. 2024) 112 F.4th 848 affect this analysis. Contrary to appellant's arguments, each of these cases are meaningfully distinguishable. In *Jardines*, the police were already within a well-recognized curtilage space, the front porch of a home, when they used a drug sniffing dog to search for evidence. (*Jardines, supra*, 569 U.S. at pp. 4, 7.) Their search was found to exceed the implied license they had to be present in that protected space. (*Id.* at pp. 8–9.) In contrast, here, the core question is whether the driveway was a constitutionally protected space where the purpose of the officer's presence must be questioned. Nothing in the record or societal norms suggests the driveway in this case is, as in *Jardines*, " 'easily understood from our daily experience' " and clearly marked as curtilage. (*Id.* at p. 7.)

In *Collins*, the curtilage question was a key component of the analysis, but the facts were meaningfully different. In *Collins*, photographs show the driveway extended along the exterior of the home and that the top portion was surrounded on two sides by a wall tall enough to shield a car and on a third side by the house. Further, the private nature of the home extended into the space through a side door from the home and a layout that encouraged a visitor heading toward the front door to leave the driveway before reaching the partially enclosed portion. On top of this, the subject vehicle was parked in this partially enclosed and protected space and covered from view by a tarp. (*Collins, supra*, 584 U.S. at pp. 589, 593.) Although some similarities exist, here there is no indication of an enclosed space closely associated with an entrance to the home holding a covered vehicle. Rather, in this case, the relevant space and objects placed within were fully visible to the public from the street and, at best, the space was connected to the backyard of the home through a gate-blocking access.[3] It was, unlike

---

[3]     An example of the differences between a typical driveway and the one found to be curtilage in *Collins* can be found in *United States v. Moses* (3rd Cir. 2025) 142 F.4th 126, which found the driveway in that case not to be an extension of the home and contrasts pictures of the

the concealed nature of the *Collins* side of house driveway, part of a common semi-public entrance to the property.

Finally, in *Chong*, the area in question was part of the driveway, but the facts supporting a curtilage finding were again significantly different. In *Chong*, the relevant space was an area one foot outside of an open garage door. (*Chong v. United States, supra*, 112 F.4th at p. 858.) The officer had reached that space by climbing over a neighbor's retaining wall and traversing a portion of the driveway that was not near to the sidewalk. (*Ibid.*) In that scenario, the court noted that although courts had grappled with how close to a home one must be to be within curtilage before finding that "under any conception of curtilage, *one foot* from the garage door entrance of a single-family home on a residential street is surely within the curtilage of that home." (*Ibid.*) In contrast, here there was no intrusion on an open access point to the home and no indication the space was, as was also the case in *Collins*, intimately tied with access to the home. Although *Chong* emphasized the closeness of the location to the home, its full analysis showed that closeness was important because the space was connected with access to and use of the home.

Ultimately, the facts of this case do not demonstrate Capriola entered the home's curtilage when he approached the publicly visible Dodge Challenger and viewed its VIN number. Nor is this conclusion undercut by the photographs submitted with appellant's motion to traverse the warrant. These photographs show a generally open driveway abutting a street and adjacent to the front yard of a small house. The back gate is slightly back from the front of the house, but not significantly so. There is a low side fence, but

---

driveway in question with pictures of the driveway in *Collins*. (*Id.* at pp. 131–133.) Similarly, *United States v. May-Shaw* (6th Cir. 2020) 955 F.3d 563 noted existing case law finding unenclosed driveways adjacent to a home or abutting a sidewalk with no steps taken to obstruct the view of passersby not to be curtilage. (*Id.* at p. 570.) Nothing in the record suggests an enclosed space such as existed in *Collins* is present in this case.

no meaningful enclosure of the space or protections taken to hide vehicles parked within. The driveway is only partially paved and does not have a paved path to the front door, but wear tracks in the lawn show people regularly utilize the yard to reach the front door. The court sees nothing in the photographs that would indicate withheld material facts or contradictions in the affidavit sufficient to traverse the warrant. (See *People v. Scott, supra*, 52 Cal.4th at p. 484 [omitted material facts must demonstrate support for probable cause was insufficient].)

For these reasons, we find no error in the trial court's ruling denying the motion to quash and traverse the warrant or to suppress evidence as the result of an illegal search.

### *Independent Review of Sealed Attachment C*

Appellant further requests we independently review attachment C, the portion of the search warrant sealed by the trial court. The People do not object but note the review should be limited to the propriety of the denial of the motion to traverse and quash the warrant.

#### *Standard of Review and Applicable Law*

A defendant may challenge the sealing of an affidavit even after a guilty plea where a challenge is made to the legality of the resulting search. (*People v. Hobbs* (1994) 7 Cal.4th 948, 956.) Under the prevailing law, on a properly noticed motion, the lower court should conduct an in camera hearing in which it first determines whether sufficient grounds exist for maintaining the confidentiality of the informant's identity. It then proceeds to determine whether it is necessary to seal the entirety of the affidavit, after which it reviews the legal sufficiency of the search warrant affidavit, considering both whether the warrant is supported by probable cause and whether there exists any basis to traverse the warrant. (*Id.* at pp. 972–974.) "A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that

12.

the omissions were material to the determination of probable cause." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297.)

*The Materials Were Properly Sealed and Support the Probable Cause Finding*

This court has reviewed attachment C and agrees with the trial court's decision to seal the attachment to protect disclosure of a confidential informant. Nothing in the attachment shows misstatements or material omissions in the public portion of the affidavit or in the overall request for a search warrant. Rather, the attachment is consistent with and essentially parallel to the public portions. More importantly, however, this court agrees with the trial court that the evidence contained in the public portion of the affidavit is sufficient, standing alone, to support a probable cause finding. Accordingly, appellant cannot demonstrate errors which would be material to the finding of probable cause in this case.

## Appellant's Supervision Condition

Appellant contends that a term of his supervised release imposed by the trial court improperly delegated judicial authority to the probation department. Appellant further contends the condition imposed does not sufficiently specify the type of treatment programs that appellant must participate in to justify the delegation made to the probation department. The People respond by claiming that the provision is not as open-ended as appellant argues and that even if it could be read in an improper manner, it should be viewed as valid until improperly imposed, as appellant retains the ability to challenge the provision if used in an improper manner. We agree with the People that the clause is not subject to only one interpretation and thus, we should view the provision as limited to a proper scope given that appellant may challenge any improper interpretation if the situation arises.

*Standard of Review and Applicable Law*

" 'The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' (Cal. Const., art. III, § 3.) Although the separation of powers doctrine 'does not prohibit one branch from taking action that might affect another, the doctrine is violated when the actions of one branch defeat or materially impair the inherent functions of another.' [Citation.] 'Separation of powers does not mean an entire or complete separation of powers or functions, which would be impracticable, if not impossible.' " (*In re D.N.* (2022) 14 Cal.5th 202, 212.)

"The portion of a defendant's sentenced term that is suspended … shall be known as mandatory supervision, and, unless otherwise ordered by the court, shall commence upon release from physical custody or an alternative custody program, whichever is later. During the period of mandatory supervision, the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation for the remaining unserved portion of the sentence imposed by the court." (§ 1170, subd. (h)(5)(B).)

A trial court has broad discretion to impose probation conditions to foster rehabilitation of the defendant and to protect the public. (§ 1203.1, subd. (j); *People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) Further, the court "has authority to empower the probation department with authority to supervise the probation conditions." (*People v. Kwizera* (2000) 78 Cal.App.4th 1238, 1240.)

"The court may leave to the discretion of the probation officer the specification of the many details that invariably are necessary to implement the terms of probation. However, the court's order cannot be entirely open-ended." (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1358–1359.) "While the probation officer may properly specify the details necessary to effectuate the court's probation conditions, it is the court's duty to

14.

determine the nature of the requirements imposed on the probationer." (*People v. Smith* (2022) 79 Cal.App.5th 897, 902 (*Smith*).)

We review challenges alleging an improper delegation of authority de novo. (*Smith, supra*, 79 Cal.App.5th at p. 902.) "When construing probation conditions, we consider their context and we use common sense. [Citation.] Where the trial court has made oral or written comments clarifying the probation condition, we may consider those comments in determining whether a challenged condition is unconstitutionally vague." (*Ibid.*) However, in most instances where "there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; accord, *People v. Pirali* (2013) 217 Cal.App.4th 1341, 1346 [stating modern rule is that the part of the record to prevail is the one that should be given greater credence in the circumstances of the case].)

*The Treatment Programs Requirement is Acceptable*

Appellant argues this case is controlled by *Smith*. In that case, the court ordered that the defendant must " 'participate in any treatment/therapy/counseling program, including residential, as directed by the probation officer.' " (*Smith, supra*, 79 Cal.App.5th at p. 902.) This broad authority was found improper under several cases discussing the substantial burden to one's liberty interests that attending an inpatient program creates. The seriousness of that burden precluded the trial court from delegating the decision to impose residential treatment to a probation officer. (*Id.* at pp. 902–903.) We find *Smith* distinguishable due to its express delegation of the authority to mandate inpatient residential treatment without further court review.

As noted in *U.S. v. Mike* (10th Cir. 2011) 632 F.3d 686, 696, a case cited by the People and by the court in *Smith*, open ended conditions which do not expressly delegate the authority to commit one to residential treatment are only potentially infirm due to

15.

their lack of clarity. A commonsense approach to these terms applies a reading which renders them valid over invalid. Thus, "[w]hen reviewing challenges to non-specific, all-encompassing conditions like the one here, other courts have opted to construe them in a manner that does not make them infirm. [Citation.] We believe this approach is best, as we see no reason to require 'district courts to include language eliminating all potential forms of treatment [or testing] not contemplated at the time of sentencing.' " (*U.S. v. Mike*, 632 F.3d at p. 696, third bracketed insertion in original.)

We agree with the logic and reasoning in *U.S. v. Mike*. At the time of imposing supervised release, it is unrealistic to expect the trial court to know exactly which treatment programs may be of greatest value, even though additional treatment will be necessary upon release from custody. Thus, a court which orders future treatment as determined to be necessary using language which does not expressly allow—but could be read to grant discretionary authority to—probation to require participation in residential treatment programs should be understood to only grant authority to require participation in a nonresidential treatment program without further court input. To the extent greater treatment may be needed, the court would need to expressly authorize that specific treatment at that time.

The oral pronouncement in this case appears to have attempted to allow probation to determine what treatment assessments may be needed, while leaving authority in the court to oversee implementation of recommended treatments. However, the express language used, requiring appellant to "participate in all treatment program assessments as directed by the Court or your probation officer, and any recommended treatment program," leaves open whether a residential treatment program recommended by probation could be required without further court order. This confusion was furthered by the box checked in the minute order with "Program Type as directed by Probation" handwritten where the normal options are "In Patient" or "Out Patient," without a similar

16.

box checked ordering any treatment at all. Rather than read this provision to improperly delegate the judicial authority to determine whether inpatient treatment is required, we apply the commonsense approach of *U.S. v. Mike* to read the term as only authorizing probation the discretion to evaluate and require nonresidential treatment programs while retaining the Court's authority to direct participation in residential treatment programs as needed. With this understanding, we reject appellant's argument an improper delegation of authority occurred.

## DISPOSITION

The judgment is affirmed.


                                                                    HILL, P. J.

WE CONCUR:


LEVY, J.


FRANSON, J.


17.